

**U.S. Department of Justice**

*United States Attorney*
*Eastern District of New York*

EAG/MEF                                    *271 Cadman Plaza East*
F.#2018R01021                              *Brooklyn, New York 11201*


October 3, 2019


<u>By Hand and ECF</u>

Honorable Vera M. Scanlon
United States Magistrate Judge
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

       Re:    United States v. Amato, <u>et al.</u>
               <u>Criminal Docket No. 19-442 (S-1) (ILG)</u>

Dear Judge Scanlon:

       The government respectfully submits this letter in support of its motion for permanent orders of detention as to the defendants Joseph Amato, Daniel Capaldo, Thomas Scorcia, Joseph Amato Jr. and Anthony Silvestro.  As set forth below, the defendants pose a danger to the community and should be detained pending trial.[1]

<u>BACKGROUND</u>

I.     <u>Proffered Facts</u>

       The government proffers the following facts regarding certain of the charged crimes.[2]  The government is entitled to proceed by proffer in a detention hearing.  <u>United States v. Abuhamra</u>, 389 F.3d 309, 320 n.7 (2d Cir. 2004); <u>United States v. LaFontaine</u>, 210

---

     [1]     The government reserves the right to argue that the defendants also pose a flight risk or that other defendants in the above-referenced matter should be detained or released on substantial bond packages.

     [2]     The proffer of facts set forth herein does not purport to provide a complete statement of all facts and evidence of which the government is aware or that it will seek to introduce at trial.

F.3d 125, 130-31 (2d Cir. 2000); United States v. Martir, 782 F.2d 1141, 1145 (2d Cir. 1986).  As the Second Circuit has explained:

> [I]n the pre-trial context, few detention hearings involve live testimony or cross examination.  Most proceed on proffers.  See United States v. LaFontaine, 210 F.3d 125, 131 (2d Cir. 2000).  This is because bail hearings are "typically informal affairs, not substitutes for trial or discovery."  United States v. Acevedo-Ramos, 755 F.2d 203, 206 (1st Cir. 1985) (Breyer, J.) (quoted approvingly in LaFontaine, 210 F.3d at 131).  Indeed, § 3142(f)(2)(B) expressly states that the Federal Rules of Evidence do not apply at bail hearings; thus, courts often base detention decisions on hearsay evidence.  Id.

Abuhamra, 389 F.3d at 320 n.7.

The proffer includes a brief description of the following: (1) the government's investigation of the Colombo family and the defendants; (2) the defendants' association with and membership in the Colombo family; and (3) the defendants' involvement in the charged criminal activity, with particular attention to the certain crimes of violence committed by the defendants.

A.      Overview of the Investigation

The indictment is the result of a multi-year investigation by this Office, the Federal Bureau of Investigation, the Drug Enforcement Administration and the New York City Police Department into the ongoing criminal activities of the Colombo organized crime family of La Cosa Nostra (the "Colombo family"), a violent criminal enterprise that engages in crimes including murder, robbery, extortion and obstruction of justice.  The present charges are the product of the government's use of a diverse array of investigative tools, including (1) court-authorized wiretaps on telephones used by defendants Joseph Amato, Joseph Amato Jr. and Thomas Scorcia, which resulted in thousands of intercepted telephone calls and text messages;[3] (2) search warrants executed at certain of the defendants' residences; and (3) witness interviews.  Notably, the evidence obtained in this investigation makes clear that the Colombo family is thriving and continues to engage in criminal activity including, among other crimes, acts of explicit violence, extortion, loansharking and the operation of illegal gambling businesses.

---

[3]      The government hereby provides notice to the defendants pursuant to 18 U.S.C. § 2518(9) of its intent to rely on wiretap interceptions at the detention hearing in this case.  In order to preserve the integrity and confidentiality of the government's investigation, notice to the defendants of the wiretap interceptions prior to their arrest was not feasible.

B.      Defendants' Membership in or Association with La Cosa Nostra

According to multiple witnesses and as alleged in the indictment, the defendant Joseph Amato is a captain in the Colombo family and Daniel Capaldo and Thomas Scorcia are inducted members of the Colombo family who both report to Amato.  Vincent Scura, another charged defendant, is also an inducted member of the Colombo family.  In becoming inducted members, Amato, Capaldo, Scorcia and Scura swore allegiance for life to the crime family above all else, even their own families.  Defendants Joseph Amato Jr. and Anthony Silvestro, among others, are associates of the Colombo family.

Significantly, communications about Scorcia and another individual's ("CC1") induction ceremony (believed to have taken place on December 11, 2018) and the fact of Scorcia's induction were intercepted over Amato's and Scorcia's cellular telephones.  For example, on October 12, 2018 (JA1 #343), Amato called CC1 and told him that he could not say no to Amato's invitation to meet him because "you never know what I mean[,]" a reference to the fact that their next meeting could be his induction in the crime family.  CC1 received that call on or about December 10, 2018, when Amato called CC1 and told him (JA1 #4425):[4]

> You still (UI) about that job tomorrow morning right? … Yeah okay, so meet me by my (UI) about nine.  … Alight he told you what tools to bring and everything right …. Alright very good, we will look at it and if it's good then you know we will go sign a contract, alright.

Later that day, Amato called him again (JA1 #4494),

| Amato: | You should go to bed early.  Did you press your clothes? |
| CC1: | Yep. |
| Amato: | You're gonna look like Barzini or what? |
| CC1: | (laughing) Barzini. |
| Amato: | Barzini, I'll see you by my mother's around 9. |
| CC1: | You got it. |

Barzini is a reference to a fictional character in the movie, "The Godfather."  The following day, law enforcement surveilled Amato, Scorcia and CC1, all of whom were dressed nicely, entering Café Di Giorno in Brooklyn, and then Panino Perfetto, where they remained for a few hours and where Scorcia and CC1 are believed to have been inducted into the crime family.

---

[4]      Intercepted communications are assigned a particular session number. Telephone calls and text messages intercepted over Amato's two cellular telephones are identified as "JA1 #" and "JA2 #"; telephone calls and text messages intercepted over Scorcia's six cellular telephones are identified as "TS1 #," "TS2 #," "TS3 #," "TS4 #," "TS5 #," and "TS6 #"; and telephone calls and text messages intercepted over Amato Jr.'s cellular telephone are identified as "JAJ #."

In subsequent telephone conversations between Amato, Scorcia and others, including one in January 2019, Scorcia and Amato repeatedly referenced Scorcia's induction. For example, on January 12, 2019 (TS1 #212), commented, "Yeah, I'm curious tonight with Fanucci," a reference to an inducted member from another crime family.  Scorcia then sheepishly said, "Yeah, well, you know, like I says, uh, he knows that you.  You don't think he don't know?  Of course, he knows," and Amato responded, "A hundred percent.  I don't think he'll go there.  He may give you a wink or something.  You know what I mean?"

In a telephone call between Amato and Scorcia on March 18, 2019 (TS3 #2388), in which Amato and Scorcia discussed a funeral for the former official boss of the Colombo family, Scorcia commented, "I ordered a charcoal grey suit, something new.  I don't want to be like a stumble bum like everybody else.  I represent you.  This way we'll be nice and sharp." In that same call, Scorcia also jokingly asked Amato, after Amato suggested that Scorcia and Capaldo drive the one-time boss's body back to New York, "Do I move up in the ranks." Based on the investigating agents' training, experience and knowledge of this investigation, there is probable cause to believe that Scorcia's comment reflected his status as an inducted member who had the potential to move up in the crime family hierarchy.  In a telephone call with Joseph Marra on April 1, 2019 (TS4 #1163), Scorcia made a comment about an individual who had "got signed up" and "got his union card."  Based on the investigating agents' training, experience and knowledge of this investigation, there is probable cause to believe that this comment refers to the individual's induction as a member of an organized crime family. Thereafter, Marra said, "Yeah, they were telling me, uh, sometimes, ya know, once you get that union card, everything behind ya gotta go," and Scorcia answered, "Yeah, I know.  I heard that too, but I pursued it and it worked out fine," which suggests that Scorcia had also received a "union card," i.e., he had been inducted.  In a telephone call on May 18, 2019 (TS6 #3461), Scorcia told another individual, "Does he know what I am?  Or does he still think I'm the same person from a couple years ago." Based on the investigating agents' training, experience and knowledge of this investigation, there is probable cause to believe that this is a reference to Scorcia's relatively new status as an inducted member of an organized crime family.  In another telephone call, this one on May 8, 2019 (TS5 #3480), Scorcia and another individual (who is not himself a crime family member) joked about a third guy.  Scorcia bragged, "He thinks he's the mob guy," all but openly admitting to a non-member his own status in the mob.  Finally, on June 5, 2019 (TS6 #2626), the day that law enforcement searched Scorcia's residence, Amato, referring to law enforcement, commented, "They definitely know that you, you know, your situation changed, you know what I mean?"  In so saying, Amato was making clear to Scorcia his belief that law enforcement tends to focus its scrutiny on inducted members of the crime family and assuring Scorcia that law enforcement knew about this change in status, i.e., Scorcia's induction.

C.     The Charging Documents

On October 2, 2019, a grand jury returned a sealed 31-count indictment against the defendants.  As charged in the indictment, for several years, defendants Amato, Capaldo, Scorcia, Amato Jr. and Silvestro have engaged in racketeering as members or

associates of the Colombo family, with a pattern of racketeering activity involving multiple instances of extortion, loansharking and operating illegal gambling businesses within the Eastern District of New York.

   The charged criminal activities by the defendants were extensive.

- Amato is charged with, among other crimes, one count of racketeering involving predicate racketeering acts relating to six victims; two counts of cyberstalking, which relate to a seventh victim; and one count of threatening to commit a crime of violence against an eighth victim.
- Capaldo is charged with, among other crimes, one count of racketeering involving predicate racketeering acts relating to three victims.
- Scorcia is charged with, among other crimes, one count of racketeering involving predicate racketeering acts relating to nine victims.
- Amato Jr. is charged with, among other crimes, one count of racketeering involving predicate racketeering acts relating to three victims, and one count of threatening to commit a crime of violence against a fourth victim.
- Silvestro is charged with, among other crimes, racketeering involving two victims of extortion and one count of threatening to commit a crime of violence against a third victim.

  D.  <u>Intercepted Communications and Other Evidence of Acts of Violence</u>

   As set forth in greater detail below, the intercepted calls and text messages, as well as cooperating and civilian witness testimony, search warrant results and other evidence, revealed the defendants' acts and threats of violence, as well as the fear of violence and helplessness that they instilled in their victims.  Significantly, evidence of nearly all of the charged crimes, and many uncharged ones, are found on telephone calls and text messages that were intercepted pursuant to court-authorized wiretaps on cellular telephones used by Amato, Amato Jr. and Scorcia.

    1.  The Defendants Took Extensive Steps
        To Evade Detection by Law Enforcement

   The defendants made extensive efforts to avoid detection by law enforcement.  For example, the defendants repeatedly made clear their intention to avoid overtly criminal conversations over the telephone.  In addition, Scorcia procured new, prepaid cellular telephones for Amato, Capaldo and himself on a monthly basis (requiring law enforcement to continually identify the new phones and obtain authorization to intercept those communications).

   Although the defendants often spoke in code and tried to avoid explicitly criminal conversations over the telephone, on occasion, they did in fact discuss overtly criminal matters.  Indeed, on one occasion after Amato Jr. described a threat to hurt

5

someone, Amato presciently said, "Let me call you back, please, because I might as well go turn myself in, alright?"  On another occasion, over a cellular telephone used by Joseph Amato Jr. (JAJ #1750), Benjamin Bifalco (charged in a separate indictment in a separate docket) first asked whether they could "talk about this on the phone"; Amato Jr. answered, "I mean why not?  You talk about everything else on the fucking phone, and you're an idiot."  Over the next few days in a series of telephone calls, Bifalco laid out his plan to fix the outcome of an NCAA men's basketball game by offering to pay thousands of dollars to multiple members of a basketball team so that they would intentionally lose by a lot (such that the favored team covered the spread, i.e., won by more than the predetermined margin of points) and tried to persuade Amato Jr. to place thousands of dollars on the game.  Shortly before the game, Amato Jr. sent two text messages to Scorcia (JAJ #2239 and JAJ #2242), "Ok I wouldn't trust the game I was telling u about" and "I'm not touching it personally[,]" which was good advice given that the favored team did not cover the spread and the bets would not have been winning ones.

2.     The Defendants Had Access to Weapons

The defendants also had access to weapons and kept them in close proximity for ready use.  In May 2017, law enforcement searched a residence of Amato, during which search they found two tasers, one disguised as a flashlight, and a canister of apparent CS tear gas with the word "Paralyzer" written on the exterior.  In June 2019, when law enforcement searched Scorcia's residence, they found, among other items, two firearms, both of which were operational.  Within a covered compartment in the trunk of Scorcia's vehicle, they found tools of Scorcia's trade: an adjustable steel baton, a ski mask, binoculars and gloves to conceal fingerprints and a book on LCN.  Photographs of certain items seized during the searches are contained in Exhibits A and B.

3.     Acts of Violence and Intimidation

Below are descriptions of certain acts of violence and intimidation by Amato, Capaldo, Scorcia, Amato Jr. and Silvestro.

a.     Assault by Amato and Amato Jr. (June 2014)

In June 2014, Joseph Amato and Joseph Amato Jr., together with several other members of Amato's crew, viciously assaulted an individual ("I-1") after I-1 expressed indifference as to Amato and his reputation on Staten Island.  The night before the assault, I-1 tried to intercede after he saw Amato Jr. disrespecting a young woman.  In response, Amato Jr. told I-1 that he should mind his own business and when I-1 persisted, Amato Jr. boasted, "Do you know who my father is?"  I-1 did not and, as a result, the following day Amato, Amato Jr. and other members of Amato's crew tried to send a message to I-1 and others to ensure that Amato was feared and that he received what Amato believed was the proper degree of respect.  Amato and his crew lured I-1 to an isolated area and then assaulted him, leaving him with significant head lacerations that required staples.

b.     Cyberstalking by Amato (2016 - 2017)

In November 2016, a GPS tracking device was found on an MTA bus in Staten Island during a routine maintenance inspection: it had been hidden in an oil pan. In fact, Joseph Amato had purchased the device to place a girlfriend, identified herein as Jane Doe, under close surveillance and used the tracking device in an attempt to maintain control over her.[5] To instill fear in Jane Doe, Amato boasted about the resources at his disposal. In one email, he wrote, "This is my island. Not yours. I have the eyes all over[.]" In another, he said, "I'm called a MANS MAN!!! … Anyone could end up in jail. I don't wish it on anyone[.] Especially weak men. Who could never deal with it. I thrived there and anywhere I go." Amato's surveillance of Jane Doe continued for a period of months and required Amato to regularly and covertly retrieve the device, charge it and then reposition it on Jane Doe's car. He abandoned the surveillance only after he discovered that the tracker was no longer attached to Jane Doe's car, at which time he reported the device lost to the electronic service provider administering the tracking service. (The device apparently had been discovered and was placed on the MTA bus, likely to thwart Amato's stalking efforts.)

Apparently not deterred by the discovery of the first device, in May 2017, Amato obtained a replacement tracking device and again took efforts to place it on Jane Doe's vehicle and surveil her movements. The surveillance however was terminated after law enforcement executed a search warrant upon Amato's residence and discovered that Amato had purchased a second device.

c.     Threats to Assault Bar Employees by
Amato, Amato Jr. and Silvestro (December 2018)

In the fall of 2018, a female with whom Amato was romantically involved accused Amato of spending time with a second female at a commercial establishment on Staten Island and told Amato that she had seen video footage confirming as much. Amato thereafter dispatched his son, Amato Jr., to threaten employees of the commercial establishment to ensure that they did not further share video footage of Amato with anyone. Amato Jr. then recruited Silvestro to carry out Amato's order.

In a telephone conversation on Friday, December 7, 2018 at 2:14 p.m. (JAJ #965), Amato Jr. told Silvestro, "We might have to go do something quick tonight. … We might have to stop by and talk to someone." Silvestro readily agreed and then they started to plan their approach. First, Amato Jr. asked, "Who do you think we can bring with us? You think we can get three or four kids to come with us?" Silvestro answered, "It depends. What are we trying to do?" Amato Jr. explained that they were going to "[h]ave a serious talk with someone. … but it would be better if like.. you know.. if a lot of people

---

[5]     The government's commenced a larger investigation of Amato following the discovery of the tracking device that had been registered to him.

coming." Silvestro also expressed his willingness to engage in violence, asking, "We're beating this [expletive]'s ass or no?" Amato Jr. said that that was not part of the plan.

A few hours later, they spoke again and Silvestro commented, "The only reason I don't want to bring another person 'cause if we are not beating his ass we really don't need it. You know?" Amato answered, "No I know. Me and you can do it, maybe one more person for looks." At approximately 8:20 p.m. that evening, when law enforcement was conducting surveillance, they observed Amato Jr. and Silvestro go to a bar on Staten Island where they stayed for approximately 20 minutes. A few minutes after they left, at 8:43 p.m. (JAJ #1059), Amato Jr. was overheard in the background of a telephone call, bragging to an unknown person about prior assaults in the same establishment, the employee's reaction ("I know what you guys are doing here. I don't want no problem with you guys.") and about how his other criminal associates, including the defendant John Cahill, would have assaulted the employee despite the mere threat having been sufficient ("If I did that with Cahill or something he would have been drunk and would have ended up hitting him for no reason or something. Sometimes words."):

> He would have broke his fucking skull open (UI) how many beatings I have given in that fucking place. (UI) I heard about you guys, I know what you guys are doing here. I don't want no problem with you guys. If I did that with Cahill or something he would have been drunk and would have ended up hitting him for no reason or something. Sometimes words.

The next day, Amato Jr. described the incident to another associate (JAJ #1225):

> Yea bro fucken it was great. We, yo we abused him so bad. Yo I had, bro me and Pap [a nickname for Silvestro] bro had him shaking bro. He was in tears, he was crying. … I said, I said the guy was in tears, he cried. … Made a grown man cry.

In so saying, Amato Jr. made clear his pride in "abusing" the employee and that Silvestro and his actions imparted the desired fear: "He was in tears, he was crying … made a grown man cry."

d. Extortion of Gambling Business Operators
by Amato, Amato Jr. Scorcia and Capaldo
(December 2018 - January 2019)

In December 2018, three family members (a father, a son and the son's cousin) were threatening to physically hurt a close friend of Amato Jr. (the "Friend") if the Friend did not make a timely payment on an outstanding gambling debt. On January 5, 2019, at the direction of Amato and others, the Friend lured two of the family members, the father and son, to a meeting place by telling them that he was going to pay them. Instead, Scorcia and Capaldo, among others, accosted them and made clear to them that they would not be receiving repayment of the debt.

In one call after it occurred on January 5, 2019, Amato Jr. told his father, Amato (JAJ #5042), "They got here they thought they were cowboys and the second (unintelligible) got there they were like church mice. … The second when they got here you know they thought they were nuts and then when we popped out they were like church mice tails between their legs okay no problem no problem."  Scorcia and Amato Jr. also exchanged a series of text messages, making clear their pleasure at having intimidated the father and son:

| | |
|---|---|
| Scorcia: | They got the message good (JAJ #5230) |
| Amato Jr.: | How embarrassing to get abused like that infront of infront of your son that was great (JAJ #5236) |
| Scorcia: | His son would have got knocked the f*** out (JAJ #5238) |
| Amato Jr.: | Forget it! They knew it would be bad if they got stupid I wish he would have said something (JAJ #5240) |
| Scorcia: | Trust me me too but he was not a butt sorry and apologetic but I just couldn't slap them but I almost seen black and I was just for the fun of It (JAJ #5242) [6] |
| Amato Jr.: | Extremely apologetic and polite as can be lol (JAJ #5246) |

e.  Conspiracy to Assault Dominick Ricigliano
by Amato, Scorcia, Capaldo, Silvestro, Suka and Masterjoseph
<u>(January – February 2019)</u>

For the past several years, Scorcia and codefendant Dominick Ricigliano both operated loansharking businesses, and in or about 2017, Ricigliano became upset that Scorcia was operating the business in locations that Ricigliano viewed as his turf.  Ricigliano went to Scorcia's office in Brooklyn, New York, where he assaulted Scorcia and vandalized his property, and then directed several of Scorcia's loansharking customers to stop paying Scorcia and instead only make payments to Ricigliano.  As noted above, in December 2018, Scorcia was inducted into the Colombo family and, upon becoming a full-fledged member of the crime family, Scorcia was determined to retaliate against Ricigliano.  Scorcia enlisted several of his codefendants for assistance, including Capaldo, Silvestro, Suka and Masterjoseph.  He also sought and received the approval of Amato, to whom he reported in the Colombo family.

First, on Wednesday, January 30, 2019, Scorcia directed one of their common loansharking customers to tell Ricigliano that he was no longer going to make payments to

---

[6]      Scorcia subsequently sent a text message to Amato Jr., suggesting that he wrote this message using the phone's voice to text function and that it was garbled in certain respects.

Ricigliano.  On the evening of January 30, 2019, Scorcia and Suka went to the Woodrow Diner in Staten Island where they planned to confront Ricigliano.  At 8:06 p.m. (TS2 #1442), Scorcia and Suka called Silvestro and complained that the Woodrow Diner was packed and they were concerned about carrying out the planned confrontation.  For example, Silvestro proposed, "I would just wait for the kid to come out the place and grab him before he gets to the car," but Suka said, "It's packed bro, there's so many cars there, there's so many people there." … Bro, I'm telling you, Tommy [Scorcia], tell him it's fucking slammed in there right now."  Scorcia echoed, "Fucking packed, people walking out with fucking kids, and like (UI) fucking (UI)."  Scorcia then lamented, "I'm fucking, I'm sick to my fucking stomach, I was just gonna walk right in there, but there's fucking people coming out with fucking families."  As an alternative, Scorcia offered, "Horrible, he's gonna have to fucking text him, because he text him and say 'Hey I want to meet you we're gonna do something here and there or whatever' and bingo (UI) fucking pop up like that maybe tomorrow afternoon or Saturday morning."  A few minutes later, at 8:37 p.m. (TS2 #1447), after Scorcia and Suka had apparently left the dinner, Scorcia and Silvestro spoke again.

| | |
|---|---|
| Scorcia: | It's a breakfast place, I get in, I'm about to get in the car I said, "fuck it, I'm gonna go in there right now." |
| Silvestro: | And this rat really parked under the fucking cameras? |
| Scorcia: | Yeah, 150%, I said, "I'm gonna go in there right now, and walk in, I'm gonna blast (PH) the kid in the face." I says, "motherfucker." |
| Silvestro: | Yeah, yeah, yeah. |
| Scorcia: | The mother fucker, the place is packed, (UI) |
| Silvestro: | Listen, at the end of the day, you can't fucking cannot jeopardize the freedom for fucking some little jerkoff like that you know what I mean |

They then started to make plans for their next attempt.  Silvestro said:

> On Saturday, we shouldn't even, we shouldn't even make it a fucking song and a dance, we jump out.  … Give him (UI) you send him a smack if he raises his hand back to you we beat the bricks off him, that's it.  …That's the bottom line, we're taking his shit, you're giving him your fucking, breaking his shit, punching him and we're out of there.

Scorcia answered, "Exactly. That's what we're gonna do."  They agreed to execute the plan on Saturday.  Scorcia also updated Capaldo about what had happened:

> Nothing, I just pulled into Woodrow or whatever, I'm gonna head home, I'm gonna head home, and uh, it just didn't work, wasn't good to fucking do the work, you know what I'm saying? Not enough time, whatever, the valves

wouldn't hold, lot of fucking people, too many people complaining they would have had no water, so it would have been really, uh, fucked up.

***

You know, one of the big plumbers that I had with me, not the one you know, the other one, he didn't like it.  You know, so, what the fuck was I gonna do? You know? Abort the job? What would we do?  We'd have to do OT on the whatever. Alright, I'll talk to you tomorrow then.  No worries, all good.

Scorcia, Silvestro, and Masterjoseph attempted to carry out the plan on the following Saturday, February 2, 2019, but the plan was thwarted when they went to Ricigliano's residence and discovered he had cameras installed that could capture their actions on a recording.  At 1:15 p.m. (TS2 #2066), Scorcia called Capaldo and asked him to put Amato on the line.

| | |
|---|---|
| Scorcia: | Oh, alright. So, hear, hear me out, the whatchamacallit, the guy that we have to do the job, off the job for, run all the lines and everything, doesn't uh, was avoiding the kid, doesn't want to meet, doesn't want to start the work, the only way he would meet the kid, to do what they have to do, would be in front of his house. |
| Amato: | They would only meet in front of his house? |
| Scorcia: | Yeah, where he's got, uh, cameras all over it. |
| Amato: | Yeah, alright, stupid, don't worry, don't go over his house, that's for sure, Cuz. |
| Scorcia: | Don't, right? |
| Amato: | No, no, you control the situation.  Don't let him control it. |
| Scorcia: | Yeah. |
| Amato: | Alright, just leave it alone, leave it until tomorrow, we'll talk, alright. |

A few minutes later, at 1:27 p.m. (TS2 #2069), Scorcia related to Suka that Amato had told him to abort the plan: "I just, uh, tried to get permission over there."  Scorcia then observed, "That's ridiculous over there by the house.  I don't know, but he's [referring to Ricigliano] fucking, (UI) chicken shit, he's got no balls, he's a telephone tough guy, you know that, you know."  On Tuesday, February 5, 2019, Scorcia and others tried again to carry out their plan to confront and assault Ricigliano.  In a call at 12:44 p.m. (TA2 #2477), Scorcia told Silvestro, "Just give me a heads up what time ya know, this way I can get the other gorilla to come and meet us, from the other day. … Five, 6:00 (UI) later, you tell m-, ya know, what do you think? Wanna get a little darker? Right? … We could do it right in New Dorp too 'cause that's where that kid lives."  Law enforcement then warned Ricigliano about the potential assault, causing Scorcia and others to abandon their plan that night.

Notwithstanding law enforcement scrutiny, as evidenced by a call on February 8, 2019 at 1:33 p.m. (TS2 #2987), wherein Silvestro told Scorcia that he had instilled fear in

"the kid," an apparent reference to Ricigliano, Silvestro followed through with some form of their plan after all:

| | |
|---|---|
| Silvestro: | I've got the funniest fucking video to show you when I see you. You're gonna pee your pants. |
| Scorcia: | Fuck! I spoke to my buddy, he says he'll let me know, so hopefully it won't be fucking dead.  He's fucking scared this fucking kid.  You don't think so? |
| Silvestro: | Bro, you have no idea what I did to him. |
| Scorcia: | Motherfucker!  Why can't I be there!?!?  Motherfucker! (Laughing)  Motherfucker. |

e.     Conspiracy to Collect a Debt
by Amato Jr. and Coffaro (February 2019)

Amato Jr. and Coffaro participated in a scheme to obtain and distribute black-market marijuana vaping cartridges.  As part of the scheme, Coffaro received several shipments from fictitious addresses in California for more than a year.  In March 2019, law enforcement intercepted one of those packages and seized more than 600 marijuana vaping cartridges.

On one occasion, Amato Jr. and Coffaro contemplated in a telephone conversation the best means to collect a debt.  Specifically, on February 15, 2019 at 10:26 a.m. (JAJ #8709), Coffaro called Amato Jr. and proposed, "Yo, I was thinking of just going there and taking a picture of the car and sending it to him and be like, 'Yo, this shit's mine until I get paid.'"  Amato suggested that they instead lure him to a location where they could then convey their threat, "No, no, no. We're gonna call, I'm gonna call him or someone's gonna call him that I'm interested in the car. … Instead of spook him immediately, I'd rather fucking make him think that I'm coming to get the car. He'll come meet up and then once he meets up then he's fucked, and then fucking he's gonna have to fucking pay something out."

f.     Conspiracy to Use Extortionate Means
by Amato Jr. and Silvestro (February 2019)

In a telephone call on February 22, 2019 (JAJ #8944), Amato Jr. and Silvestro discussed two or more individuals who owed money and a third individual ("the actual kid") who was (unsuccessfully) trying to collect the money from the two or more individuals. They further discussed that Amato Jr. wanted to intervene before the third individual was successful in collecting money from the others.  In the same conversation, they also referenced Scorcia's involvement – who they called "the plumber."

| | |
|---|---|
| Amato Jr.: | When did those [UI] stop [UI]? Those [UI] are bad bo. |
| Silvestro: | Something's wrong with them right? |
| Amato Jr.: | Bro, what do you think at this point, no? |

| | |
|---|---|
| Silvestro: | Uh yeah I mean they gotta die. |
| Amato Jr.: | We gotta get to 'em before the actual kid gets to 'em 'cause the actual kid is like, "I'm gonna try today and Tuesday I'm supposed to meet 'em and if that doesn't work out, I will see if you can help and you know how you are going to do it." I want the whole thing. |
| Silvestro: | Tell the kid to fucking stay back stay back. We'll [UI] take care of it. You know? |
| Amato Jr.: | If we can get on this ASAP, it could be a good thing. |
| Silvestro: | Bro I'm getting on it tomorrow, I'm meeting up with the plumber tomorrow and I'm gonna tell him listen, if fuckin' you don't go and get these kids today, then I'm just gonna go and beat their ass and I'm going to go beat their Dad's ass too. So it's up to you. I was supposed to see the plumber tomorrow anyway. |
| Amato Jr.: | Yeah, that fucking plumber. |
| Silvestro: | That fucking plumber. |

g.    Extortionate Collection of a Debt
       by Scorcia and Masterjoseph (April 2019)

As noted above, Scorcia operated a very lucrative loansharking business, as part of which Scorcia gained access to a significant amount of money and lent it to others at exorbitant interest rates and under the threat of bodily harm if debtors did not make timely payments on the accrued interest. To ensure both that they could locate their debtors and that their debtors understood that Scorcia knew where they resided, they required debtors to provide copies of their drivers' licenses and their contact information.

In a telephone call between Scorcia and Silvestro on April 30, 2019 at 11:47 a.m. (#1592), Scorcia recounted to Silvestro a recent incident where he, Masterjoseph and another man who was large in stature approached a delinquent loansharking customer in an effort to physically intimidate him and thus ensure more regular payment on outstanding loans. Further, they discussed that, during the incident, the customer expressed fear (through his tears) and Scorcia hit him. Specifically, Scorcia told Silvestro that one of his loansharking customers was "on track with me [Scorcia] like fucking clockwork twice a week." He then explained that although "the Lion," a reference to Ricigliano, had claimed credit for that and did tell Scorcia that he was "willing to take a ride with me," Scorcia instead "took our own fucking, our friend with us." Continuing, Scorcia said, he told "Al," a reference to Albert Masterjoseph, and "another guy, bigger than him" and that "when he [the loansharking customer] seen him pop out of the car and the other guy was opening up the

13

door, I told the guy sit in the car, and the kid had the tears, like between me and you, like ... 'No, please, T. [i.e., a reference to Scorcia]. No.' Boom! But we'll talk about that in person. I got this kid good right now."

DISCUSSION

I.    Legal Standard

A.    Bail Reform Act

Under the Bail Reform Act, 18 U.S.C. § 3141 et seq., federal courts are empowered to order a defendant's detention pending trial upon a determination that the defendant is either a danger to the community or poses a risk of flight or obstruction of justice. 18 U.S.C. § 3142(e) ("no condition or combination of conditions would reasonably assure the appearance of the person as required and the safety of any other person and the community"). A finding of dangerousness must be supported by clear and convincing evidence. United States v. Ferranti, 66 F.3d 540, 542 (2d Cir. 1995); United States v. Chimurenga, 760 F.2d 400, 405 (2d Cir. 1985). A finding of risk of flight must be supported by a preponderance of the evidence. United States v. Jackson, 823 F.2d 4, 5 (2d Cir. 1987); Chimurenga, 760 F.2d at 405.

The Bail Reform Act lists four factors to be considered in the detention analysis: (1) the nature and circumstances of the offenses charged, (2) the weight of the evidence against the defendant, (3) the history and characteristics of the defendant, and (4) the nature and seriousness of the danger to any person or the community that would be posed by the defendant's release. 18 U.S.C. § 3142(g).

B.    Organized Crime Defendants

Courts in this circuit have routinely faced the issue of pretrial detention of organized crime defendants charged with racketeering-related offenses. See, e.g., United States v. Cirillo, Cr. No. 05-212 (SLT), slip op. (E.D.N.Y. 2005) (Genovese family acting bosses Dominick Cirillo and Lawrence Dentico, as well as Genovese family captain Anthony Antico, detained as dangers to the community), aff'd, 149 Fed. Appx. 40 (2d Cir. 2005); United States v. Gotti, 219 F. Supp. 2d 296, 299-300 (E.D.N.Y. 2002) (Gambino family acting boss Peter Gotti detained as danger to the community), aff'd, United States v. Ciccone, 312 F.3d 535, 543 (2d Cir. 2002); United States v. Agnello, 101 F. Supp. 2d 108, 116 (E.D.N.Y. 2000) (Gambino family captain Carmine Agnello detained as danger to the community); United States v. Defede, 7 F. Supp. 2d 390, 395-96 (S.D.N.Y. 1998) (Luchese family acting boss Joseph Defede detained as danger to the community); United States v. Salerno , 631 F. Supp. 1364, 1375 (S.D.N.Y. 1986) (Genovese acting boss and captain detained as danger to the community), order vacated, 794 F.2d 64 (2d Cir.), order reinstated, 829 F.2d 345 (2d Cir. 1987).

Together, these cases stand, at the very least, for the following propositions: (1) organized crime defendants often constitute dangers to the community due to the high likelihood that they will continue to commit crimes if released on bail, and (2) elaborate bail packages involving home detention and electronic monitoring are insufficient safeguards to protect the community against dangerous organized crime defendants.

1.      Organized Crime Defendants Are Likely
         to Commit Crimes if Released on Bail

Organized crime defendants pose a particular threat to the community due to the continuing nature of the charged enterprise and its violent criminal activities.  At bottom, because organized crime defendants are career criminals who have pledged their loyalty to an illegal enterprise, they pose a distinct threat to commit additional crimes if released on bail.  See Salerno, 631 F. Supp. at 1375 (finding that illegal businesses of organized crime require constant attention and protection, and recognizing strong incentive on part of its leadership to continue business as usual).

In addition, defendants pose a danger to the community not only when they commit acts of violence, but when it is likely that they will commit even non-violent crimes that are detrimental to the community.  See Senate Report at 3195 ("language referring to safety of the community refers to the danger that the defendant might engage in criminal activity to the detriment of the community . . . .  The Committee intends that the concern about safety be given a broader construction than merely danger of harm involving physical violence.").  In Colombo, the court held that "[i]n light of Congress' direction that '[w]here there is a strong probability that a person will commit additional crimes if released, the need to protect the community becomes sufficiently compelling that detention is, on balance, appropriate.'"  United States v. Colombo, 777 F.2d 96, 99 (2d Cir. 1985) (quoting Senate Report at 3189).  In Salerno, the court upheld the detention of two leaders of the Genovese organized crime family, noting:

> The activities of a criminal organization such as the Genovese Family do not cease with the arrest of its principals and their release on even the most stringent of bail conditions.  The illegal businesses, in place for many years, require constant attention and protection, or they will fail.  Under these circumstances, this court recognizes a strong incentive on the part of its leadership to continue business as usual.  When business as usual involves threats, beatings, and murder, the present danger such people pose in the community is self evident.

631 F. Supp. at 1375.

2.      Elaborate Bail Packages Are Insufficient to Protect the Community
        Against Violent Organized Crime Defendants

Finally, the Second Circuit repeatedly has rejected "elaborate" bail packages
for dangerous defendants, including members of organized crime families shown to be
involved in violent criminal activities.  See United States v. Boustani, 932 F.3d 79 (2d Cir.
2019 (holding that Bail Reform Act does not permit two-tiered bail systems where wealthy
defendants are effectively released to self-funded private jails); United States v. Dono, Nos.
07-5333-cr(L), 07-5334-cr(CON), 275 Fed. Appx. 35, 2008 WL 1813237, at *2-3 (2d Cir.
Apr. 23, 2008) (rejecting conditions that included, among others, home detention and
electronic monitoring, and requirement that defendant's father – a retired police officer –
take "personal responsibility" for defendant); Ferranti, 66 F.3d at 543-44 (rejecting $1
million bail secured by real property); United States v. Orena, 986 F.2d 628, 630-33 (2d Cir.
1993) (rejecting $3 million bail secured with real property, in-home detention, restricted
visitation and telephone calls, and electronic monitoring); Colombo, 777 F.2d at 97, 100
(rejecting, among other conditions of release, $500,000 bail secured by real property).

The Second Circuit has viewed home detention and electronic monitoring as
insufficient to protect the community against dangerous individuals.  In United States v.
Millan, the Second Circuit held that:

> Home detention and electronic monitoring at best elaborately
> replicate a detention facility without the confidence of security
> such a facility instills.  If the government does not provide staff
> to monitor compliance extensively, protection of the community
> would be left largely to the word of [the defendants] that [they]
> will obey the conditions.

4 F.3d 1039, 1049 (2d Cir. 1993) (internal citations and quotation marks omitted).  See also
Orena, 986 F.2d at 632 ("electronic surveillance systems can be circumvented by the
wonders of science and of sophisticated electronic technology") (internal citation and
quotation marks omitted).

Similarly, courts in this district have denied dangerous defendants bail in
recognition of the Second Circuit's dim view of the effectiveness of home detention and
electronic monitoring.  See, e.g., Dono, 2008 WL 1813237, at *2-3 (noting that the idea that
"'specified conditions of bail protect the public more than detention is flawed'") (quoting
Orena, 986 F.2d at 632); United States v. Cantarella, No. 02-CR-307 (NGG), 2002 WL
31946862, at *3-4 (E.D.N.Y. Nov. 26, 2002) (adopting "principle" of "den[ying] bail to
'dangerous' defendants despite the availability of home detention and electronic surveillance
and notwithstanding the value of a defendant's proposed bail package"); Agnello, 101 F.
Supp. 2d at 116 (Gershon, J.) ("the protection of the community provided by the proposed
home detention remains inferior to that provided by confinement in a detention facility");
United States v. Masotto, 811 F. Supp. 878, 884 (E.D.N.Y. 1993) (rejecting bail because "the
Second Circuit appears to be saying to us that in the case of 'dangerous defendants' the Bail

Reform Act does not contemplate the type of conditions suggested by this Court [including home confinement and electronic monitoring] and that, even if it did, the conditions would not protect the public or the community, given the ease with which many of them may be circumvented").

II.      The Defendants Pose A Danger to the Community

The defendants pose a substantial danger to the community.  As discussed more specifically below, each of the relevant considerations under the Bail Reform Act strongly favors detention here.

A.      Nature and Circumstances of the Crimes Charged

Each of the defendants whose detention is sought is charged with one or more crimes of violence under the relevant provisions of the Bail Reform Act.  See United States v. Ciccone, 312 F.3d 535, 542 (2d Cir. 2002) (citing 18 U.S.C. § 3156(a)(4)(A), (B)) (Bail Reform Act defines a "crime of violence" as an offense that has as one of its elements the "attempted use, or threatened use of physical force against the person or property of another," or "any other offense that is a felony and that, by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense"); Chimurenga, 760 F.2d at 404 (conspiracy to commit a crime of violence is a crime of violence for purposes of the Bail Reform Act).  Here, the defendants extorted money from their victims through explicit and implied threats of force and violence, threats which were made more credible by the defendants' membership in and association with La Cosa Nostra.

B.      Evidence of the Defendants' Guilt

As discussed above, the evidence of the defendant's guilt is exceedingly strong.  The government intends to prove the defendant's guilt at trial through the testimony of multiple witnesses, wiretap intercepts, consensual recordings, and physical and documentary evidence.

C.      History and Characteristics of the Defendants

1.      Joseph Amato

Amato's history and characteristics clearly favor detention.  His dangerousness is demonstrated by the charged and uncharged conduct in this case, including Amato's use of violence and his direction and approval of violence and threats of violence against others.  In fact, as a captain of the Colombo family, he has a network of criminal associates that he can direct to commit crimes on his behalf.

Nor is this Amato's first offense based on his association with the Colombo family.  In or about 1996, Amato was convicted of (1) following trial, one count of being an

accessory after the fact to a murder in aid of racketeering (the charged enterprise was the Colombo crime family), in violation of 18 U.S.C. § 3, and (2) under a separate indictment and following a guilty plea, one count of possession of a firearm during and in relation to a crime of violence, in violation of 18 U.S.C. § 924(c)(1).  For both of those offenses, Amato was sentenced to a 211-month term of imprisonment, a 3-year term of supervised release, restitution in the amount of $11,222.35, a fine of $50,000 and a $100 special assessment.  He was released from federal prison on April 3, 2009.

### 2.   Daniel Capaldo

Capaldo's history and characteristics also favor detention.  First, Capaldo has several prior convictions for serious crimes, including several in federal court, and has a prior history of violating the court's conditions of release (namely, by committing crimes).

- On January 7, 1993, Capaldo pleaded guilty in Kings County Supreme Court to criminal possession of a controlled substance in the second degree and was sentenced to 66 months to life imprisonment in a New York correctional facility.
- On February 3, 1993, Capaldo pleaded guilty in Richmond County Supreme Court to two offenses, including criminal sale of a controlled substance in the second degree, and was sentenced to 8 years to life imprisonment in a New York correctional facility.
- On April 11, 1995, Capaldo pleaded guilty to conspiracy to distribute narcotics and conspiracy to defraud the United States (by failing to pay taxes owed) and was sentenced to 168 months' imprisonment in federal custody.  He was released on September 5, 2008.
- On December 1, 2010, Capaldo pleaded guilty to collection of unlawful debt in the Southern District of New York and on November 16, 2011, Capaldo pleaded guilty to financing an extortionate loan.  Capaldo was sentenced to 41 months' imprisonment on both counts.

Notably, while on supervised release following his release in 2008, Capaldo repeatedly violated the related terms.  In January 2009, while Capaldo was serving a term of supervised release, Capaldo was inducted into the Colombo family.  He also committed the crimes to which he pleaded guilty in 2010 and 2011 while serving his term of supervised release.  Capaldo pleaded guilty to a supervised release violation in this district, and was sentenced to a six-month concurrent term of imprisonment.

Capaldo was released from federal prison on November 3, 2015 and then served a three-year term of federal supervised release, which terminated on November 2, 2018.  Six days later, on November 8, 2018, Capaldo was intercepted speaking to Amato on the court-authorized wiretap, making plans to meet that evening, and based on the nature of their conversation, it did not appear to be their first conversation.  Moreover, between November 2018 and June 2019, Capaldo used eight different pre-paid telephone numbers, which he used to communicate with Amato (his captain) and other members of the Colombo family in furtherance of the charged racketeering offense.

3.    Thomas Scorcia

Scorcia's history and characteristics also favor detention.  While Scorcia does not have any prior convictions, he is charged with numerous serious offenses, including racketeering, extortion and operating a wide-ranging loansharking business as a member of the Colombo family.  These offenses, by their very nature, involve violence or threats of violence, which, as demonstrated by the intercepted calls above, Scorcia employed in furtherance of his loansharking business.  In addition, the intercepted communications demonstrate that Scorcia has various Colombo associates at his disposal who are willing to carry out his directives and commit crimes on his behalf.

As these communications demonstrate, Scorcia used violence and explicit threats of violence to coerce loanshark debtors into making payments, and these threats were made credible by Scorcia's membership in the Colombo family.  He then enlisted the help of Colombo family associates like Silvestro to carry out those threats, making plans to visit debtors at times when they were vulnerable and could be more easily intimidated.

4.    Joseph Amato Jr. and Anthony Silvestro

Finally, the history and characteristics of Amato Jr. and Silvestro favor detention.  Although neither Amato Jr., nor Silvestro has prior criminal convictions, the intercepted communications make clear that they are ready, willing and able to carry out violence and threats of violence and carry out other tasks requested by crime family members.  For example, when Amato Jr. told Silvestro they had to do something on the evening of December 7, 2018, Silvestro readily agreed and volunteered, "beat" someone, despite having no idea of who was going to be beat or the reason for the beating.

Amato Jr. and Silvestro also agreed to less glamorous tasks when called upon by the crime family.  For example, in advance of a meeting between Amato and Capaldo, among others, and members of another crime family, Amato asked his son to drive him.  On December 18, 2018, Amato Jr.'s father, Amato, asked Amato Jr. to drive him to a meeting in Manhattan.  Amato Jr. tried to recruit Silvestro to help him:

| | |
|---|---|
| Amato Jr.: | Tomorrow night I gotta fucking drive to the city and fuckin and I don't know how long I'll be waiting around for in the city and I wanted to see if you wanted to come with me while I wait. |
| Silvestro: | What do you have to do out there? |
| Amato Jr.: | I don't got to do shit.  I just got to drop someone somewhere and wait. |
| Silvestro: | What part? |
| Amato Jr.: | I don't know. |
| Silvestro: | Yeah I'll be in the city 100%.  What time you gonna come there though? |
| Amato Jr.: | I don't know, I find it all out last minute type of shit |

| Silvestro: | Yeah 'cause you could get parking spot out there too. |
| Amato Jr.: | He [referring to his father, Amato] asked if I wanted to bring someone and I wanted to bring you. Bring someone to keep me company. |

Ultimately, Amato found another driver and Amato Jr. and Silvestro were not needed, but Amato Jr. and Silvestro's willingness to do drive Amato and then wait for several hours speaks to their association with the crime family and willingness to further its goals.

       D.    <u>Seriousness of Danger Posed by the Defendants' Release</u>

      In light of their membership in or association with the Colombo family, a violent criminal enterprise, and their involvement in crimes of violence, the seriousness of the danger posed by the defendants' release should not be underestimated.  As noted above, courts in this circuit have recognized that where, as here, organized crime defendants are charged with employing violent conduct, the risk of continued violent conduct is substantial and justifies detention.  <u>See</u> <u>Salerno</u>, 631 F. Supp. at 1364.

*          *          *

      In sum, based on each of the four relevant factors, the defendants are a danger to the community and should be detained.

CONCLUSION

For the foregoing reasons, the government respectfully requests that the Court enter permanent orders of detention with respect to the defendants.

Respectfully submitted,

RICHARD P. DONOGHUE
United States Attorney

By:     ___/s/_____
Elizabeth Geddes
Megan E. Farrell
Assistant U.S. Attorneys
(718) 254-6430/6448

## Exhibit A:

Photographs of Items Seized from Scorcia's Vehicle in June 2019



Exhibit B:

Items Seized from Amato's Residence in May 2017

 

